**CREDIT REGULATION**

**HOME IMPROVEMENT CONTRACTS – LICENSING REQUIREMENTS**

January 7, 1994

*Mr. Joseph E. Owens*
*Deputy Secretary of Licensing & Regulation*

You have requested our opinion whether a home improvement contractor is required to obtain an installment loan license as a prerequisite to offering its customers financing for home improvement projects. You have also asked whether there are circumstances under which a home improvement contractor might need a mortgage lender's license if the offered financing is secured by a lien on the homeowner's residence.

The answers to these questions cannot be simply stated, because of the varied features of transactions that may be offered under several credit statutes; these transactions, in turn, significantly affect the analysis whether certain licensing provisions apply. In brief, our conclusions are as follows:

1. If a home improvement contractor finances its sale of goods and services to a homeowner and that financing is secured by a lien on the homeowner's residence, the contractor is required to obtain a mortgage lender's license unless the financing contract is assigned without recourse to a mortgage lender licensee (or a person exempt from mortgage lender licensing) within 30 days after the contract is completed.

2. If a home improvement contractor extends credit to customers under Title 12, Subtitles 9 or 10 of the Commercial Law ("CL") Article, Maryland Code (whether secured in any way or unsecured) and *also* extends any credit secured by a secondary lien on residential real property in that or another transaction, the contractor probably is required to obtain an installment loan license. This conclusion, however, cannot be free from doubt given a glaring inconsistency in the relevant statutory language, and it appears that many contractors may not have obtained such a license because of

a good-faith belief that they were not required to do so. This matter deserves prompt review by the General Assembly.

3.    If a home improvement contractor extends credit to customers under any subtitle of CL Title 12 other than Subtitles 9 or 10 or under the common law "time-price differential" doctrine, the contractor is not required to obtain an installment loan license.

# I

## Factual Background

For purposes of this analysis, the following will serve as a factual summary of the manner in which home improvement contractors conduct their business and undertake to obtain financing of their contracts for homeowners who are their customers. Although this summary reflects what we understand is the business practice of most home improvement contractors, there may be variations in terms and procedures from contractor to contractor; these variations could result in different conclusions than those reached in this opinion.

Home improvement contractors (hereafter referred to as "Contractors") typically sell both goods and services – that is, the materials that will be added or affixed to the homeowner's premises, together with the labor and expertise to assemble or install those goods. These activities are regulated by the Maryland Home Improvement Commission ("MHIC") under Title 8 of the Business Regulations (BR") Article, Maryland Code.[1] The MHIC has issued regulations that govern most aspects of the business, including the contract between the Contractor and the homeowner and related terms of the contractual relationship. Except for a requirement that the contractor may not require a down payment that exceeds one third of the total contract price, no provision of the statute or regulations that the MHIC enforces purport to govern any of the financing aspects of a home improvement contract.[2]

---

[1] "Home improvement" and "home improvement contract" are defined in BR §8-101.

[2] The down payment limitation  (one-third of the purchase price) is

(continued...)

Generally speaking, Contractors assist their customers with the financing aspect of a home improvement project in either of two ways. First, the Contractor may itself extend credit to the homeowner. This method is called "indirect financing." This term reflects the fact that most home improvement contractors do not hold the deferred payment contracts, but rather sell or assign them to third parties in exchange for cash. The ultimate creditor (the assignee of the paper) is then considered an "indirect" extender of the credit, via the Contractor.

Second, the Contractor can identify for the homeowner a third party willing to make a loan in the amount of the contract price. This method is called "direct financing." The Contractor may assist the homeowner in applying for the credit and even act as a liaison between borrower and lender. In direct financing situations, however, the contractor generally does not receive any additional compensation attributable to the referral of the customer to the lender for a direct loan.

These circumstances have, over time, resulted in the development of ongoing business relationships between Contractors and third party sources of funding such as depository financial institutions (*e.g.*, banks, and savings and loan associations, also known as savings banks) and other similar sources of funding (hereafter referred to as "financing entities"). In fact, a financing entity typically specifies the manner in which the financing aspect of the transaction must be conducted and supplies the written documents to ensure that the finished financing contract complies with those requirements.

Over the years, Contractors and their financing entities have developed a wide variety of contract terms and forms to reflect those provisions. These various terms dictate which of the several subtitles under CL Title 12 apply to the transaction and, accordingly, what type of license, if any, must be obtained from the Commissioner of Consumer Credit. Of special pertinence in this regard are the type of property in which a security interest is taken to secure the loan and whether the loan is intended to be made under CL Title 12, Subtitle 10, or pursuant to some other subtitle of CL Title 12. Generally

---

[2] (...continued)
set out in BR §8-617.

speaking, the loan may be unsecured; secured by the "goods" supplied by the contractor, which are to be used in the home improvement work to be done under the contract; secured by a lien on the homeowner's residence; or secured by both types of collateral.

## II

## Direct Financing

If a financing entity makes a loan of money directly to the homeowner, the Contractor need not obtain either an installment loan license or a mortgage lender's license. The only possible licensing issue here would arise in the event that the Contractor received compensation, either from the borrower or the financing entity, for referring the loan application to the lender or performing other services directly connected with the financing aspect of the transaction, as opposed to the home improvement itself. If such compensation is received in a loan transaction secured by a lien on the residential real property, then the Contractor would be acting as a mortgage broker and would be subject to licensure under the Maryland Mortgage Lender Law ("MMLL"), Title 11, Subtitle 5 of the Financial Institutions ("FI") Article, Maryland Code.[3] Similarly, if the Contractor received compensation for referral of an unsecured loan or for a loan secured by collateral other than real property, the Contractor would fall within the definition of a "credit services business" set forth at CL §14-1901 and would be required to obtain an installment loan license. *See* CL §14-1908. The typical direct financing transaction, however, does not involve any compensation to the Contractor for referring the customer to the financing entity.

Whether the loan is really made "directly" to the borrower may depend on the facts of the particular situation. For example, the contract for the work to be done and the financing agreement may become intermingled if the loan transaction and the home improvement provisions are evidenced by the same document. The situation is particularly problematic when the contract is signed by the homeowner before the work under the home improvement

---

[3] The definition of "mortgage lender" set forth in FI §11-501(j) includes "any person who ... [f]or a fee or other valuable consideration, whether received directly or indirectly, aids or assists any person in procuring a mortgage loan ...."

contract begins and is not transferred to the financing entity until after completion. A conclusion that a transaction is truly "direct" financing can only be reached after an assessment of the particular factual circumstances. If a loan is truly "direct," however, then the Contractor does not need an installment loan license or an MMLL license.

## III

## Indirect Financing

### A.    *Mortgage Lender License*

When a contractor enters into a financing plan with a homeowner and the plan is secured by the customer's residence, the Contractor is engaging in a transaction that ordinarily would bring the Contractor under the licensing requirement of the MMLL. *See* FI §§11-501 and 11-504. However, FI §502(a)(10) provides that the licensing requirement does not apply to a "home improvement contractor licensed under Article 56 of the Code who assigns a mortgage loan without recourse within 30 days after completion of the contract to a person licensed under this subtitle or to an institution that is exempt from this subtitle under paragraphs (1) and (2) of this subsection."

While there may be factual issues about when a particular contract has been "completed," the language in this subsection would seem to settle the question whether a mortgage lender's license is required if the contract is transferred "without recourse," so long as the transferee is either an MMLL licensee or an institution listed as exempt. Because the MMLL license requirement is triggered by the type of collateral securing the credit (that is, a lien on residential real property), rather than where the credit finds a home among the various subtitles of CL Title 12, this conclusion applies to any indirect credit secured by a first or a second lien on residential real property.

### B.    *Installment Loan License*

#### 1.    *Time-Price v. Loan of Money*

The question of when an installment loan license is needed in indirect financing situations must begin with an inquiry into the difference between a loan of money and what is known as a "time-price differential." The courts have accepted the principle that when

the purchase price in a sale transaction is deferred over time, even if the total payments exceed the price of the item or service if it were bought outright at the time that the sale is initiated, the difference in the price is not considered "interest" because the transaction is not considered a loan. *Financial Credit Corp. v. Williams*, 246 Md. 575, 229 A.2d 712 (1967); *Rothman v. Silver*, 245 Md. 292, 226 A.2d 308 (1967); *Falcone v. Palmer Ford, Inc.*, 242 Md. 487, 219 A.2d 808 (1966). Therefore, the courts have held that the usury laws do not apply to these "time-price" transactions:

> [A] bona fide sale of personalty at a deferred purchase price greater than the cash price is not subject to the usury laws, even though the price on credit is arrived at by adding a per cent to the cash price in excess of the legal rate of interest or is stated as a rate of interest (which would be usurious if the transaction were a loan) on a note given for all or part of the purchase price.... The reasons given are that a sale of property is not a loan or forbearance of money and the owner of property has a right to name the price at which he will sell and may offer his property at one price for cash or a much higher price on credit and the advanced price will not constitute usury ....

*Rothman v. Silver*, 245 Md. at 298-99 (citations omitted).

Indirect financing by a home improvement contractor falls squarely within this "time-price" doctrine and is therefore not considered to be a loan of money, regardless of whether there is an attendant grant of a security interest in real or personal property. Moreover, the assignment or transfer to a financing entity after the credit has been extended does not affect this treatment. The credit continues in character as originally made. This result has implications for the application of various statutory credit regulations to these transactions, and hence the application of the licensing requirements under the Installment Loan Law ("ILL"), FI Title 11, Subtitle 3. The type of property taken as security also matters in determining which subtitles of CL Title 12 apply.

### 2.    *The ILL Licensing Statute*

FI §11-302 prohibits a person from engaging in the business of making "installment loans," or making more than five such loans per year, unless the person is licensed or is exempt from licensure. That same section then goes on to define "installment loan" as "a loan or extension of credit made for consideration under §§12-103(a)(3) or (c), Title 12, Subtitle 9, or Title 12, Subtitle 10 of the Commercial Law Article." The question whether a Contractor needs an installment loan license will first depend upon whether the indirect extension of credit is made under any of these listed provisions of the Commercial Law Article.

### a.    *Title 12, Subtitle 1*

Because of the time-price differential doctrine, we can very quickly eliminate CL §12-103(a)(3) and (c) as a basis for licensure. These provisions, by their terms, govern loans of money, not time-price sales. The definitions governing the entirety of Title 12, Subtitle 1 make that conclusion unquestionable: A "borrower" is "a person who *borrows money* under this subtitle"; a "lender" is "a person who *makes a loan* under this subtitle"; and "usury" is "the *charging of interest by a lender* in an amount which is greater than that allowed by this subtitle." CL §12-101(b), (f), and (k) (emphasis supplied).

An indirect extension of credit by a Contractor is not a loan of money and therefore is not made under CL §12-103(a)(3) or (c).

### b.    *CL Title 12, Subtitles 9 and 10*

Contractors are eligible to extend credit under CL Title 12, Subtitle 9 (for revolving credit) and CL Title 12, Subtitle 10 (for closed-end credit).[4] CL §12-1001(b) includes within the definition

---

[4] "Revolving" credit is typified by a bank-issued credit card with a maximum credit line. The balance may increase and decrease from time to time depending upon the cardholder's use and repayment. In contrast, "closed-end" credit envisions a single extension of credit in a fixed amount that is repaid either in a lump sum or periodic payments. In closed-end credit, repayments do not enable the debtor to access any further advances beyond the initial credit extended.

(continued...)

of "credit grantor" the term "retailer." While "retailer" is not defined in the subtitle, it is highly likely that the term would be held by the courts to include any seller of goods and services to the consuming public, such as a home improvement contractor. *See Craftsman Painters & Decorators v. Carpenter*, 111 Colo. 1, 137 P.2d 414 (1943); *Capitol Building Co. v. Langton,* 101 R.I. 131, 221 A.2d 99 (1966). Accordingly, CL Subtitle 10 is clearly available for use by a Contractor to finance the sale of goods and services. *See* CL §12-1002.

As a result of an amendment effective October 1, 1993, if the Contractor desires to extend credit under Subtitle 10, the documents evidencing the extension of credit must contain a written election of that subtitle. CL §12-1013.1.[5] If they do not, the provisions of Subtitle 10 will not apply, leaving the Contractor to contend with whatever other credit laws enacted prior to Subtitle 10 may apply to the type of credit being extended.

If the Contractor elects to extend credit under Subtitle 10, then the issue of licensing under the ILL must be addressed. While the definition of "installment loan" in FI §11-302 clearly includes any credit extended under Subtitle 10, there is an exemption from the license requirement that may apply to some Contractors. FI §11-301(b)(6) provides as follows:

---

[4] (...continued)

Contractors do not offer revolving credit under Subtitle 9 on an indirect basis. Therefore, the ensuing analysis talks only about Subtitle 10. However, it is possible for revolving credit to be extended either in the form of a home equity line of credit or an unsecured line of credit, which the financing entity takes by assignment after the contract is completed. The licensing analysis for this possibility is largely the same as that presented with reference to Subtitle 10. There are, however, some differences with respect to home-secured revolving credit that will not be discussed in this opinion because, as far as we are aware, no home improvement contractors currently offer even direct financing on a revolving basis.

[5] This provision was enacted in Chapter 404 (House Bill 424) of the Laws of Maryland 1993, a legislative response to the decision of the Court of Appeals in *Biggus v. Ford Motor Credit Corp.*, 328 Md. 188, 613 A.2d 986 (1992).

> (b)  The  licensing  provisions  of  this subtitle do not apply to any of the following persons,  if  organized  under  the  laws  of  this State  or  otherwise  qualified  to  do  business  in this State:
>
> . . .
>
> (6) A seller of goods or services or both not engaged in:
>
> (i)  Making loans;
>
> (ii)  Offering  extensions  of  credit secured by secondary liens on residential real property; or
>
> (iii)  Acting  as  a  credit  services business as defined under Title 14, Subtitle 19 of the Commercial Law Article.

Under this provision of the licensing statute, therefore, a Contractor is exempt from the ILL license (and thus may make loans under Subtitle 10 without obtaining the license) *unless* the Contractor also makes loans, extends credit secured by second liens on residential property, or acts as a credit services business.

As we stated at the outset, Contractors typically do not make loans of money, nor are they engaged in activities which would bring them within the definition of "credit services business."  *See* CL §14-1901(b).  A significant number of Contractors do extend credit secured by secondary liens on residential real property, however.  It appears from the language of FI §11-301(b)(6) that, if a contractor does any second-lien secured indirect financing, then this exemption from licensure *does not* apply.

While the limits of the exemption in the ILL provisions appear clear, CL  §12-1015(a) muddies the waters considerably.  This section provides as follows:

> (a) Except for a seller of goods or services not engaged in making cash advances to be paid to or for the account of a borrower, a credit grantor making a loan or extension of credit under this subtitle is subject to the licensing,  investigatory,  enforcement  and

penalty provisions of Title 11, Subtitle 3 of the
Financial Institutions Article.

In this section, basically the same licensing exemption exists for sellers of goods or services found in the ILL. Unlike the ILL exemption provision, however, the exemption in CL §12-1015(a) *does* apply to a seller who also extends credit secured by a second lien on residential real property. Thus, a Contractor who secures indirect financing with a second lien on the customer's home appears under CL §12-1015 to be exempt from the ILL licensing provisions, while FI §11-301(b)(6) unequivocally requires the Contractor to obtain a license. In this respect, the two statutes are in direct, irreconcilable conflict.

This is not a situation in which the particular credit grantor provision in the Commercial Law Article is silent about an exemption from the licensing provision, while the ILL specifically supplies those exemptions (for example, the exemption of banks and other depository institutions). In that situation, the statutes can be harmonized. CL §12-1015 makes no mention of banks or other institutions but simply makes all "credit grantors" (defined in §12-1001(b) to include such institutions) "subject" to the provisions of the ILL. Therefore, the exemptions in the licensing statute are not mentioned, let alone contradicted, in the credit statute. In marked contrast, both statutes address the exemption for sellers in two different, directly conflicting ways.

We are not without guidance in attempting to resolve conflicts of this kind. First, we are to presume that the General Assembly intended all of its enactments to operate together as a consistent and harmonious body of law. *Farmers & Merchants Bank v. Schlossberg*, 306 Md. 48, 61, 507 A.2d 172 (1986). Repeal by implication is not favored. *State v. Harris*, 327 Md. 32, 607 A.2d 552 (1992). If two statutes are in irreconcilable conflict, however, "the same presumed legislative intent requires that the statute whose relevant substantive provisions were enacted most recently be held to have repealed by implication any conflicting provisions of the earlier statute." *Farmers & Merchants Bank v. Schlossberg,* 306 Md. at 61. *See also Plaza Corp. v. Alban Tractor Co.,* 219 Md. 570, 151 A.2d 170 (1959).

Although the starting place for interpreting a statute is the language used by the General Assembly read in a normal way, "the general purpose [of a statute] is a more important aid to the meaning than any rule which grammar or logic may lay down." *Kaczorowski v. City of Baltimore*, 309 Md. 505, 525, 525 A.2d 628 (1987). Sometimes that purpose can be discerned through a review of the history when the statutory text itself fails to convey the purpose adequately. 309 Md. at 515.

CL Subtitle 10 (together with CL Subtitle 9) was enacted as Chapter 143 (Senate Bill 591) of the Laws of Maryland 1983. The legislative history indicates that the bill was originally proposed as a response to a more permissive regulatory environment in Delaware and other contiguous states, which had helped these states draw jobs in the financial industry away from Maryland.

The initial proposals would have created new lending statutes applicable to banks only. As the bill took shape, however, most other businesses engaged either in lending or extending credit to facilitate sales saw the advantages of the new lending subtitles. These other lenders persuaded the Legislature to include them in the definition of "credit grantor," thus making them eligible to use the new law.

As non-depository lenders were made eligible to use what was to become CL Subtitles 9 and 10, a provision was included in Senate Bill 591 requiring certain credit grantors to obtain a license under the already existing ILL provisions. Several amendments later, the provisions regarding licensing in CL Subtitle 10, which ultimately were enacted as CL §12-1015, exempted certain sellers of goods and services and read as follows:

> (a) Except for a seller of goods and services not engaged in making cash advances to be paid to or for the account of a borrower *or offering extensions of credit secured by a secondary lien on residential real property*, a credit grantor making a loan or extension of credit under this subtitle *not secured by a secondary lien on residential real property* is subject to the licensing, investigatory, enforcement and penalty provisions of Title 11, Subtitle 3 of the Financial Institutions Article.

      (b) In addition to the license required by subsection (a) of this section, a credit grantor making a loan or extension of credit under this subtitle secured by a secondary lien on residential real property is subject to the licensing, investigatory, enforcement and penalty provisions of Title 12, Subtitle 3 of the Financial Institutions Article.

(Emphasis supplied.) The 1983 version of CL §12-1015(a) is certainly much closer than that of the current provision to the wording of the exemption in FI §11-301(b)(6). In fact, the ILL exemption for sellers (which, as we have seen, does not extend to sellers who do second-lien secured indirect financing) was enacted for the first time as part of the same legislation. Therefore, at first blush it would appear that, at least in 1983, the General Assembly intended to exempt from ILL licensure only sellers of goods and services who *did not* secure their extensions of credit with a second lien on residential real property. Yet even this conclusion is made problematic by the second half of the single sentence enacted in 1983 as CL §12-1015(a). The second independent clause of that sentence, which begins after the first comma with the words "a credit grantor making a loan ...," seems to be saying that a credit grantor is only subject to ILL licensure in the first place if the credit grantor is extending credit that is *not* secured by a second lien on residential real property. If this language were given literal effect, the preceding clause, limiting the scope of the exemption from licensing, would be meaningless. These seemingly inconsistent provisions appear in the same sentence and were enacted at the same time.

      Perhaps a grade-school teacher of a generation ago could sort out this grammatical morass of double negatives. Under the teaching of *Kaczorowski*, however, such gyrations are not the route to discerning the purpose of the statutory scheme. The best reconciliation of these provisions is to view the first half and the second half of the 1983 version of CL §12-1015(a) as each addressing altogether different subjects, albeit the language fails to make the distinction clear. The first half of the subsection concerned sellers of goods or services only. The second half gave a separate, independent exemption to licensees under the former Secondary Mortgage Loan Licensing Law and was not intended to affect sellers.

In support of this view, subsection (b) of CL §12-1015 expressly made the licensing requirement for secondary mortgage lenders then in effect applicable to extensions of credit under CL Subtitle 10, if they were secured by a secondary lien on residential real property.   After the enactment of Chapter 143, the Commissioner of Consumer Credit did not require secondary mortgage licensees to obtain a license under the ILL as a prerequisite to using CL Subtitle 10.  This administrative policy was based upon the view that the second half of CL §12-1015(a) addressed − and exempted − secondary mortgage loan licensees.  A practice of this kind, established soon after the passage of a statute, is quite persuasive in interpreting provisions applied by the administrative body.  *See, e.g., Maryland Classified Employees Ass'n v. Schaefer*, 325 Md. 19, 33, 599 A.2d 91 (1991); *Falik v. Prince George's Hosp.*, 322 Md. 409, 416, 588 A.2d 324 (1991).

Moreover, the provisions enacted in the ILL as a part of the same bill did not suffer from the same internal ambiguity. Presumably, had the exemption for second mortgages established in the second half of CL §12-1015(a) been intended to affect sellers, then the same language would have found its way into the pertinent licensing provision of the ILL.

The upshot is that, while there remains some doubt, the better view is that in 1983 the General Assembly intended to exempt sellers of goods and services who wanted to use CL Subtitle 10 from ILL license only if they did *not* extend credit secured by a second lien on residential real property.[6]

From this less than certain conclusion, we move to the 1989 enactment of the MMLL, which amended CL §12-1015 from its prior apparent internal inconsistency to its present irreconcilable conflict with FI §11-301(b)(6).

In 1989, the General Assembly decided to revamp the licensing requirements for mortgage lenders.  Previously, two statutory schemes were potentially applicable to non-depository mortgage lenders, the Mortgage Banker/Mortgage Broker law, FI Title 12, Subtitle 5, administered by the Bank Commissioner, and the Secondary Mortgage Loan Licensing Law, former FI Title 12,

---

[6] The only mention of home improvement contractors in the legislative history is inconclusive.

Subtitle 3, administered by the Commissioner of Consumer Credit. Licensees under the latter law were permitted to engage in any type of mortgage lending, but the statutory scheme provided no structure for regulating these licensees when they engaged in transactions other than second mortgages. *See* 73 *Opinions of the Attorney General* 326 (1988). Mortgage Banker licensees could only make or broker first mortgages. Among other things, the bonding requirements and license fees were inconsistent. For these and a host of other reasons described in the legislative history, Chapter 476 of the Laws of Maryland 1989 was enacted, repealing both of these licensing laws and replacing them with the MMLL, governing all mortgage lenders.

As part of this enactment, many references to the Secondary Mortgage Loan Licensing Law and the Mortgage Banker statute were deleted or changed in the Commercial Law Article. Among these changes, all references to second liens on residential real property were deleted from CL §12-1015, including the exception to the exemption for sellers. Noting in the title or legislative history of Chapter 476 indicates the slightest intention to substantively change the *ILL* licensing provisions as they applied to sellers of goods or services extending credit under Subtitle 10.

The exemption from ILL licensure that the second half of §12-1015(a) had previously afforded to secondary mortgage loan licensees was removed. No similar exemption was enacted for MMLL licensees. Accordingly, since the effective date of the MMLL, the Commissioner of Consumer Credit has required MMLL licensees to obtain an ILL license as a prerequisite to extending credit under Subtitle 10. Gone, therefore, is the internal inconsistency in CL §12-1015(a). But there is no clue explaining why the first half of CL §12-1015(a) was changed (as a part of the enactment of the MMLL), creating the conflict with the ILL licensing statute.

The story does not end there, because Chapter 628 of the Laws of Maryland 1991 added an additional exception to the exemption for sellers set forth in FI §11-301(b)(6). As was true of the 1983 enactment, the General Assembly was changing the licensing statute to reflect a new requirement that a person subject to regulation under a different statutory scheme obtain an ILL license. This time it was "credit services businesses." *See* CL §14-1901. The new exception made clear that a seller of services could not escape the licensing requirement if it engaged in credit services business activities.

Applying the principles of statutory interpretation discussed earlier to these statutes, we conclude that the prudent course of action for a Contractor doing indirect financing under Subtitle 10 is to obtain an installment loan license, unless the Contractor extends *no* credit secured by a second lien on residential real property. Although the 1989 MMLL enactment is the latest legislative enactment that directly changed the exemption provisions applicable to sellers whose financing is secured by a secondary mortgage, that law did not state such a change as part of its purpose. Moreover, the General Assembly has since amended the exemption for sellers found in the ILL licensing provisions, without disturbing the second mortgage language.

Additional support for this conclusion may be derived from the familiar rule of statutory interpretation that enactments dealing with a specific topic will govern in the event of a conflict with a more general statute, with respect to situations that fall within the purview of both enactments. *GEICO v. Insurance Comm'r,* 332 Md. 124, 132, 630 A.2d 713 (1993); *Farmers & Merchants National Bank v. Schlossberg*, 306 Md. at 48; *A.S. Abell Publishing Co. v. Mezzanote*, 297 Md. 26, 464 A.2d 1068 (1983). The ILL is more specific than Subtitle 10 as to licensing issues, because licensing is the total sum and substance of the ILL. Subtitle 10 is a generic credit regulation governing all aspects of the extension of closed-end credit. To the extent licensing is addressed, it is part of a larger, more general scheme.

To summarize, our best assessment of this statutory puzzle is that if the question were litigated, the courts are more likely than not to hold that the ILL licensing provisions predominate. But the real answer ought to come from the General Assembly, which needs to resolve the conflict and bring certainty to those engaged in this business.

## C.    *Statutes for Which No License is Needed*

### 1.    *CL Title 12, Subtitle 4*

Despite our conclusion that an ILL license is necessary for certain Contractors to utilize Subtitle 10, there are alternative means of credit extension that do not require a license.

Indirect financing that is secured by a second lien on residential real property may be made under CL Title 12, Subtitle 4, the Secondary Mortgage Loan Law. In fact, after October 1, 1993, if the documents evidencing the financing agreement do not elect Subtitle 10 in writing, the loan will automatically be deemed subject to Subtitle 4. CL §12-1013.1. *See also Schmidt v. Beneficial Finance Co.*, 285 Md. 148, 400 A.2d 1124 (1979). Subtitle 4 applies to time-price financing as well as a loan of money. The definition of "secondary mortgage loan" set forth at CL §12-401(i) is as follows:

> "Secondary mortgage loan" means a loan *or deferred purchase price* secured in whole or in part by a mortgage, deed of trust, security agreement, or other lien on real property located in the State, which property:
>
> (i) Is subject to the lien of one or more prior encumbrances, except a ground rent or other leasehold interest; and
>
> (ii) Has a dwelling on it designed principally as a residence with accommodation for not more than four families.

(Emphasis supplied.)

In an extensive analysis of the meaning and scope of the term "deferred purchase price," then Assistant Attorney General Robert deV. Frierson concluded that it was intended to include the financing of home improvements; accordingly, "an installment sale home improvement transaction secured by a secondary mortgage is subject to the [Secondary Mortgage Loan Law] unless the transaction is made pursuant to Subtitle 10 of the Commercial Law Article." Letter of advice to Commissioner of Consumer Credit Alan T. Fell, at 12 (January 24, 1986). We concur.

Other than the MMLL license, which, as discussed in Part IIIA above, can be avoided by transferring the financing contract within 30 days of completion, there is no license requirement for making a loan or extension of credit under Subtitle 4.

### 2.    *Retail Installment Sales*

If the indirect financing is secured by an interest in the goods supplied by the Contractor, the financing agreement, if Subtitle 10 is not elected, will meet the definition of an "installment sale contract" set forth in the Retail Installment Sales Act ("RISA"), CL Title 12, Subtitle 6:

> "Installment sale agreement" means a contract for the sale of consumer goods, negotiated or entered into this State, under which:
>
> (i) Part of all of the purchase price is payable in one or more payments after the making of the contract; and
>
> (ii) The seller takes collateral security or keeps a security interest in the goods sold.

CL §12-601(1)(1).

There is lively debate as to whether a home improvement contract, which involves the sale of both goods and services, can fall within the reach of RISA's regulatory coverage, because the statute purports to govern only sales of "tangible personal property," which is the definition of the term "goods." CL §12-601(g). The debate stems largely from case law around the country, and in Maryland, that draws a distinction between contracts for the sale of goods versus services for purposes of determining the applicability of Article 2, "Sales," of the Uniform Commercial Code ("UCC").[7] In Maryland, at least two tests have been articulated by the Court of Appeals for determining whether Article 2 applies to a contract for the sale of both goods and services. The first is the "predominant purpose" test, which asks whether the predominant purpose is the sale of goods, with incidental labor included (for example, sale and installation of a water heater), or instead is the sale of a service with goods added incidentally (for example, a contract with an artist for

---

[7] In Maryland, UCC Article 2 is codified as CL Title 2. The Sales Article, by its express terms, applies only to sales of "goods," as opposed to services.

a painting). *Burton v. Artery Co., Inc.,* 279 Md. 94, 367 A.2d 935 (1977).

The other test, called the "gravaman" test, was announced by the Court of Appeals in a products liability case against the seller/installer of an in-ground swimming pool. *Anthony Pools v. Sheehan*, 295 Md. 285, 455 A.2d 434 (1983). The Court held in that case that the warranty provisions of the UCC Sales Article applied because the injury was allegedly caused by a defective diving board (goods), rather than negligent installation services. Thus the "gravaman" of the issue in dispute involved the goods, rather than the services, irrespective of the "predominant purpose" for the whole contract.

There is good reason to believe that neither of these tests would be wholly determinative of the applicability of a credit regulation statute such as RISA. First, the Court of Appeals has limited application of the predominant purpose test, holding, in a tax case not involving the UCC, that it was only one of several pertinent factors. *Comptroller of the Treasury v. Equitable Trust Co.*, 296 Md. 459, 464 A.2d 248 (1983). Moreover, the Court has already applied RISA to home improvement contracts, although never directly addressing the issue whether the services sold under the contract affect that applicability. *See Financial Credit Corp. v. Williams*, 246 Md. 575, 229 A.2d 712 (1967). *See also United States v. Bland*, 159 F. Supp. 395 (D. Md.), *aff'd*, 261 F.2d 109 (4th Cir. 1958). So, too, has the Attorney General. 56 *Opinions of the Attorney General* 244 (1971).

Finally, the few cases interpreting the credit regulation laws make much of the remedial nature of the statutes. *United States v. Bland*, 159 F. Supp. at 396; *Hudson v. Maryland State Housing Co.*, 207 Md. 320, 114 A.2d 421 (1955); *Stride v. Martin*, 184 Md. 446, 41 A.2d 489 (1945). In contrast, the UCC is more of a non-regulatory scheme for ordering civil liability in commercial transactions. These principles appear to have led the Court of Appeals to apply one set of regulatory laws governing credit, even when the contract may have been intended to be governed by a different statute. *Biggus v. Ford Motor Credit*, 328 Md. 188, 613 A.2d 986 (1992) (discussing application of RISA provisions to a contract made under Subtitle 10)*; Schmidt v. Beneficial Finance Co.*, 285 Md. at 157 (Subtitle 4, governing second mortgages, applied to a contract intended to be offered under Subtitle 3, the Consumer

Loan Law). In both of these cases, the Court of Appeals seemed to analyze the applicability of the particular credit law by simply comparing the terms of the contract with the definitions found in the statute, notwithstanding that other terms of the contract met other definitions elsewhere. Thus, in *Schmidt,* it did not matter that many of the terms of the contract only appeared in loans made under the Consumer Loan Law, so long as other terms met the definition of a "secondary mortgage loan" under Subtitle 4.

For these reasons, the likely result is that a contract for the mixed sale of goods and services, such as a home improvement contract, will be subject to RISA simply because a part of the contract, the sale of goods, falls within the definition in CL §12-601(1) of "installment sale contract."[8] There is, however, no direct financing under RISA and no licensing requirement under the ILL.

### 3.    *Other Credit Mechanisms*

Finally, there are two possible alternatives to unsecured lending under Subtitle 10, neither of which requires an ILL license.

It is at least arguable that the closed-end credit provisions of the Retail Credit Accounts Law ("RCAL"), CL Title 12, Subtitle 5, may apply to unsecured indirect financing, if Subtitle 10 is not elected. A "retail credit account" is defined in CL §12-501(1) as "an agreement or transaction for the retail sale of *goods and services*, which is negotiated or entered into and pursuant to which a time sale price is established." This statute does not provide for the extension of credit on a secured basis. The RCAL definition of the term "goods" expressly *excludes* "[h]ome improvement, as defined in the Maryland Home Improvement Law, or any transaction under that law." CL §12-501(h)(3)(iii). The definition of "services," however, *includes* "services furnished in connection with the improvement of real property." CL §12-501(n)(2). These facially inconsistent

---

[8] It is also possible that, if the financing contract is secured both by the goods supplied and a secondary mortgage on the customer's residence, both RISA and Subtitle 4 might simultaneously apply. Such appears to be the teaching of *Biggus v. Ford Motor Credit.* Thus, the terms of the financing would be required to comply with the regulatory restrictions under both statutes. Neither of these statutes requires an ILL license, however.

provisions can be harmonized by interpreting the definition of "services" as excluding mixed contracts for the sale of goods and services. Under this analysis, a contract with a homeowner which involves the Contractor providing labor and expertise only, might fall within the RCAL. If, however, there is any sale of goods that falls within the definition of a "home improvement," or a "transaction under that law," it appears that the contract falls outside the definition of a retail credit account.[9]

On balance, it is most likely that the courts would not apply RCAL, as it presently reads, to mixed sales of goods and services that meet the definition of "home improvement" in the Business Regulations Article. However, a home improvement contract for services only would appear to be subject to the provisions of RCAL. In any event, no ILL licensee is needed to extend credit under RCAL.

Even if RCAL is not an available alternative to Subtitle 10, unsecured, indirect financing may be offered by a Contractor under what has come to be known in the lending industry as the "unregulated time-price differential doctrine." This doctrine currently has its most common application to time-deferred contracts for the sale of goods that, although otherwise meeting the definition of an "installment sale agreement" under RISA, are outside the regulatory framework because the price of the goods exceeds $25,000.[10] Thus, a seller that finances the sale of an item with a cash price higher than that amount is arguably left uncovered by any of the provisions of CL Title 12, assuming that Subtitle 10 has not been elected.

The unregulated time-price doctrine seems to fit the situation in which a Contractor offering indirect, unsecured financing does not elect Subtitle 10. If the RCAL cannot be applied to the terms of the financing contract, there is no other niche in CL Title 12 into which this type of financing fits. As might be anticipated, no license under

---

[9] This analysis is not altogether satisfactory either, because the definition of "home improvement" under the Business Regulations Articles does not limit the term to contracts where goods as well as services are provided. BR §8-101(g).

[10] Under RISA, the definition of "goods" is limited to "tangible personal property that has a cash price of $25,000 or less." CL §12-601(j).

the ILL is required for extending credit under the unregulated time-price doctrine.

## IV

## Conclusion

In sum, a home improvement contractor that desires to extend indirect financing under CL Title 12, Subtitle 10 is probably required to obtain an Installment Loan Law license from the Commissioner of Consumer Credit, although this conclusion is not free from doubt. If the Contractor takes a security interest in the customer's residence, a mortgage lender's license is required unless the financing contract is transferred within 30 days after completion of the contract. If the Contractor is extending indirect financing outside of Subtitle 10, the Contractor need not obtain an Installment Loan Law license.

Joseph Curran, Jr.
*Attorney General*

J. Steven Lovejoy
*Assistant Attorney General*

Jack Schwartz
*Chief Counsel*
  *Opinions and Advice*